OR THE DISTRICT OF COLUMBIA

WILLIAM CHARLES HUGHES
30 CENTRE ST. APT. #1
CONCORD, NH 03301
(603) 224-2046



FILED
FEB - 8 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

VS.
PAMELA BLUM FINKEL
~~~~~~~~, A PERSON CLAIMING CIA AFFILIATION

MISSOURI DEPARTMENT OF MENTAL HEALTH
1706 E. ELM ST.
JEFFERSON CITY, MO 65102

KEITH SCHAFER
1706 E. ELM ST.
JEFFERSON CITY, MO 65102

Case: 1:08-cv-00236
Assigned To : Sullivan, Emmet G.
Assign. Date : 2/8/2008
Description: Pro Se General Civil

JURY ACTION

RICHARD GOWDY
1706 E. ELM ST.
JEFFERSON CITY, MO 65102

LORI DEROSEAR
5300 ARSENAL ST.
ST. LOUIS, MO 63139

SHERYL FINLEY
5300 ARSENAL ST.
ST. LOUIS, MO 63139

1

*Hughes v. Doe et al*                                                    1

I seek statutory, actual, and punitive damages, restitution, disgorgement, and injunctive

relief from a coordinated program for a period of over twelve years to chill and abrogate

my rights under the First, Fourth, and Fifth Amendments of the United States Constitution.

The lead defendant, PAMELA BLUM FINKEL has directed, controlled, and coordinated a program that

has involved character assassination, suppression and illegal distribution of the plaintiff's

intellectual property, and what the intelligence community calls "psychological

operations," which involve engaging surrogates to deliver veiled threats, druggings,

poisonings, and attempts to murder the plaintiff.

In conducting these operations, the lead defendant and others have, during specific

identifiable periods of time, directed intense harassment that meets the legal definition of

torture under United States Law and the Universal Declaration of Human Rights. The lead

defendant, on August 2, 2004 admitted to the plaintiff that she acts in behalf of the Central

Intelligence Agency. Involvement by the CIA will be addressed in separate litigation. In

taking actions against the plaintiff, the defendants have committed the following violations

of law, the United States Constitution, and relevant international human rights agreements

to which the United States of America is a signatory:

> (1) Section 241 of the Racketeer Influenced and Corrupt Organizations Act
>
> (RICO) by conspiring to injure, oppress, threaten, or intimidate the plaintiff.
>
> In doing so, the defendants have denied the free exercise and enjoyment of
>
> the plaintiff's rights and privileges reserved to him by the United States
>
> Constitution and the laws of the United States.

(2) Section 373 of the Racketeer Influenced and Corrupt Organizations Act (RICO) by attempting to use, attempt to use, or threaten the use of physical force in violation of the plaintiff's constitutional rights and the laws of the United States. The defendants have further solicited, commanded, influenced, and otherwise endeavored to persuade other persons to engage in such conduct.

(3) Section 1964 of the Racketeer Influenced and Corrupt Organizations Act (RICO) by injuring the business and property of the plaintiff by suppressing his intellectual property and damaging personal property in the form of computers, telephones, and automobiles.

(4) The Copyright Act of 1976 17 USC 201(a) and 201(c) by divulging, publishing, and distributing the plaintiff's copyrighted material through involuntary seizure, transfer, and exercise of rights of ownership reserved exclusively to the plaintiff as sole author. The lead defendant, in the course of illegal intelligence-gathering, used numerous contacts in the Los Angeles area to sabotage the screenwriting efforts of the plaintiff, acting purportedly in behalf of the Central Intelligence Agency.

(5) The First, Fourth, and Fifth Amendments to the United States Constitution, through a targeted program whereby the plaintiff's First Amendment rights were abrogated and chilled. Violations of the Fourth Amendment occurred when the plaintiff's intellectual property and personal communications were illegally seized and transferred by electronic means. Violations of the Fifth Amendment occurred when persons evidently acting

in behalf of the Central Intelligence Agency, under the control and direction

of the lead defendant and others, made a concerted and persistent effort

through psychological operations that rose to meet the legal definition of

torture to imply the plaintiff had committed unspecified crimes. A number

of federal agencies and high government officials apparently participated in

these operations, and the probable involvement of legitimate officials of the

United States Government will be addressed in separate litigation.

(6) Article Five of The Universal Declaration of Human Rights, to which

the United States of America is a signatory, which states, "No one shall be

subjected to torture or to cruel, inhuman or degrading treatment or

punishment."

(7) Though not creating any substantive or procedural right in a civil

proceeding, the plaintiff alleges specific, identifiable actions of the

defendants met the definition of torture contained in USC 18 113C 2340 (2)

(a), (b), (c), and (d).


(2)

The plaintiff alleges this program of psychological operations, which at times met the

definition of torture under the laws of the United States and international agreements, was

conducted at three locations: St. Louis Psychiatric Rehabilitation Center, 5300 Arsenal

Street, St. Louis MO 63139, where the plaintiff was employed as a Licensed Clinical

Social Worker from August 1, 2006 until June 18, 2007; 911 St. Rita Avenue, Apartment 2

South, Clayton, Missouri 63105, where the plaintiff resided from March, 2003 to October,

2007; and 30 Centre Street, Apartment #1, Concord, NH 03001, where the plaintiff
presently resides.

The operations directed against the plaintiff at St. Louis Psychiatric Center began after the
plaintiff reported suspected patient abuse on March 3, 2006. In filing a legally mandated
report, the plaintiff followed all advice and directives issued by his immediate social work
supervisor, Angela O'Niell, who is not a defendant in this case, and the Unit Manager,
Sheryl Finley, who is a defendant. In this situation, Ms. O'Neill's input was essentially
advisory, while Ms. Finley, acting as Unit Manager, to the best of the plaintiff's
knowledge, made all administrative decisions.

As the program of harassment progressed, and in the plaintiff's judgment, no relief could
be expected from state officials, a series letters was sent to the United States Department of
Justice, Civil Rights Division. At that time, the plaintiff was acting out of concern for the
patient's under the Civil Rights of Institutionalized Persons Act (CRIPA), as there had
been a second incident of patient abuse and neglect involving a patient being inadequately
supervised and offering prostitution services in the restroom. On May 24, 2007, a staff
meeting was held regarding the patient at risk, but nothing was done to deter the
perpetrators from having access to the patient in question. The plaintiff gave United States
Department of Justice attorney Jonas Giessler a lengthy telephone interview on the abuses
observed, and a copy of all correspondence with Mr. Geissler is submitted as EXHIBIT 1.
The plaintiff ultimately resigned from St. Louis Psychiatric Center on June 18, 2007, after
reaching a state of physical exhaustion directly attributable to the operations directed

against him. The plaintiff's medical condition was confirmed near the time of his

resignation by a physician at Saint Louis University Hospital. Actions of St. Louis

Psychiatric Rehabilitation Center and its staff included:

> 1. Sending maintenance men repeatedly to the plaintiff's office, which had
>
> only one exit. The maintenance staff would block the doorway as tools were
>
> produced (drills, hammers, etc.) that could be used as a weapon.
>
> 2. Making comments in the halls that could be justifiably construed as a
>
> threat, such as when an unidentified painter said, "One shot...five million
>
> dollars!"
>
> 3. Making gestures as if a person's head was being twisted with lethal
>
> intent.
>
> 4. Making agonistic noises in the plaintiff's presence.
>
> 5. Requiring the plaintiff to attend meetings with administrators of a
>
> disciplinary nature where it was alleged the plaintiff's perceptions of the
>
> patient abuse were faulty and suggesting the plaintiff suffered from a mental
>
> disorder. The absurdity of these allegations was expressed by the hospital's
>
> regional manager, who said at the conclusion of one such meeting on March
>
> 12, 2007, "I don't know why I was invited to this meeting."
>
> 6. Falsely alleging the plaintiff had used the hospital credit card without
>
> proper authorization.
>
> 7. Failing to make key computer programs operational on the plaintiff's
>
> personal computer and then requiring work output that depended on said
>
> programs under a threat of disciplinary action.

8. Omitting the plaintiff from e-mail required to perform job responsibilities
adequately and deleting e-mail from the plaintiff's Microsoft Outlook
folders that would have proven action was taken on job-related
responsibilities in a timely manner.

9. Setting arbitray work product deadlines for the plaintiff only, when state
judicial processes related to the work did not require it.

10. Rendering state vehicles required for the plaintiff's duties inoperable or
"hiding" the vehicles on the state hospital grounds when needed to conduct
official business.

These actions, and many more too numerous to mention were perpetrated on the plaintiff
to make it appear he was not responsibly discharging his job responsibilities. When the
plaintiff took a day off on April 30, 2006, Ms. Finley scheduled a "job interview" for a
party who was said to be highly-desired to "help the team." On that same day, a business
jet flew extremely low over the plaintiff at the intersection of Big Bend and Laclede
Station Roads in St. Louis, Missouri. Plaintiff alleges JANE DOE, a person claiming CIA
affiliation, was a passenger on that aircraft, and came to the "job interview" to better
direct a coordinated program of psychological torture against the plaintiff.


(3)

At 911 St. Rita Avenue, St. Louis, Missouri 63105, concurrent with the program detailed
above and accelerating after the plaintiff resigned his position at St. Louis Psychiatric
Rehabilitation Center, an "in home" program of psychological operations and torture was
conducted at that address that involved the following actions by other tenants at 911 St.

Rita and neighbors in the adjacent building at 913 St. Rita:

1. Repeated vandalism to the plaintiff's car, which was disabled by these actions. When the plaintiff purchased a new car, it was vandalized as well.

2. A program of electronic surveillance whereby all of the plaintiff's intellectual property, and possibly all of the content of personal computers was intercepted and stolen with no judicial process known to the plaintiff. This electronic surveillance is being addressed separately through *Hughes v. Whitlock* in the 8th Circuit. Plaintiff has ample reason to believe Jane Doe coordinated this activity, which may have also included "bugging" the plaintiff's residence and illegally monitoring telephone communications.

3. Neighbors holding conversations in public hallways intended to be overheard by the plaintiff in which intelligence-gathering terminology was used, such as "MI" to denote "military intelligence."

4. Parties who did not reside in the building continually coming and going for no discernable reason.

5. Parties "hiding" in the building after the legitimate tenants had departed for work. These parties would then suddenly exit when the plaintiff entered common areas of the building with intent to startle and intimidate.

6. Continual breaking and entering of the plaintiff's residence. At times, items would be left askew, and on other occasions, small items would be stolen, which were sometimes later returned.

7. Important mail, such as credit card statements and invoices for health

insurance were hidden from the plaintiff by intruders, presumably to deprive

the plaintiff of health insurance and/or cause creditors to penalize based on

late payments. Plaintiff alleges a key objective of Jane Doe's program was

to destroy the plaintiff financially.

8. Massing male visitors in adjacent apartments who appeared to have

hostile intent to terrorize the plaintiff by creating fear he would be harmed

or abducted.

9. Leaving items outside the plaintiff's apartment intended to intimidate,

including a dead cat and a syringe.

10. Neighbors driving multiple vehicles, in one case five different vehicles,

to obscure who was present in the building.

11. Digging a grave-sized hole on an adjacent construction site and massing

unidentified males to terrorize and imply the plaintiff's murder was

imminent. Many of these anomalies were reported to the Clayton Chief of

Police in a letter dated October 2, 2007. This produced a follow-up visit by

two detectives who appeared to fairly evaluate the plaintiff's allegations and

expressed no concern that the plaintiff's perceptions were in any way faulty.

The letter to Chief Byrne is submitted as EXHIBIT 2.


It should be of interest to the court that the plaintiff's investigation determined, through a

search of city records, that the address of "911" St. Rita was achieved by renumbering the

city block, which can only be presumed to have some relation to Jane Doe's self-professed

affiliation with the Central Intelligence Agency.

(4)

In April, 2007, as part of a participatory effort to write a book on the special significance of

the New Hampshire Presidential Primay, the plaintiff filed as a Democrat candidate for the

office of President of the United States and relocated on November 5, 2007 to 30 Centre

Street, Apartment #1, Concord, New Hampshire 03301.


It should immediately be noted that the plaintiff has determined this block was also

renumbered to change 28 Centre Street to 30 Centre Street. This has been confirmed by a

representative of telecommunications provider Verizon and the United States Postal

Service. Parking lot markings and notations on utility service boxes are also visible that

indicate this change was made. "30" in the "spy realm" indicates "termination." Plaintiff

alleges this residence was made available as part of an elaborate ruse, also under the

direction of Jane Doe, acting as an agent of the Central Intelligence Agency.


Upon moving-in, the plaintiff was advised by the landlord, Tony Armano, who is not a

defendant in this suit, that the neighbors were a problem due to excessive traffic of people

and automobiles. Nonetheless, the plaintiff signed a one-year lease. From November 5,

2007 to the date of this filing, unknown parties have committed the following actions in

violation of United States law, the United States Constitution, and The Universal

Declaration of Human Rights:


      1. Engaging in apparent drug commerce as evidenced by a great number of

*Hughes v. Doe et al*                                                                          10

individuals noisily coming and going all night long.

2. Having young men, presumably involved in said drug commerce, rush up to the plaintiff with apparent hostile intent.

3. Depriving the plaintiff of restful sleep by banging, shouting, and dragging furniture across the floor at all hours. Unidentified parties apparently were somehow aware of the sleep-awake cycle of the plaintiff such that for a period of approximately six weeks the plaintiff was able to sleep only a maximum of 3-4 hours consecutively.

4. Depriving the plaintiff's motor vehicle from free transit by blocking the only exit from 30 Centre Street, Concord, New Hampshire 03301. Unknown parties also blocked the plaintiff's assigned parking place, and snowplowed-in the plaintiff's car.

5. Sending-in males clad in ski masks when the temperature was above freezing to terrorize the plaintiff by creating an impression he may be abducted or harmed.

6. In three separate incidents—December 24, 2007; January 3, 2008; and January 6, 2008—unknown parties injected a chemical that leached off of the radiators at 30 Centre Street, Apartment #1 and twice caused respiratory arrest in the plaintiff. In the December 24 incident, the plaintiff awoke and thought perhaps food had become lodged in his esophagus. Several attempts to expel food were unsuccessful, and the plaintiff was unable to draw a breath for approximately 5-10 seconds. The plaintiff's investigation found an installation on the boiler at 30 Centre Street, Concord, NH  03301 that

apparently allows for a toxic chemical to be injected into a seemingly innocuous commercial system and pumped to the radiators. Photographs of this system are submitted as EXHIBIT 3. The system has an electrical control box that appears to allow the option of pumping a toxic substance into any of the three apartments at this address. Of note as well is the existence of what seems to be a remote broadcast alarm device wired with the on/off switch that appears to serve as a means of warning if a target attempts to shut the system off. Plaintiff protected himself by turning off the valve that supplies water to his radiators which is in the foreground of PHOTO 2. Plaintiff also calls the court's attention to PHOTO 3 and the fact the pump to his residence, Apartment #1 is black in color, and the others are light green. Plaintiff alleges this is a premeditated "killing system" installed to murder a resident of this address.

On January 3, 2008, the plaintiff again suffered respiratory arrest following a shower. Apparently, the same toxin had been injected into the hot water tank. This incident was lengthier, with the plaintiff unable to breathe for approximately 15 seconds and a distance of ten paces toward the front door. By January 6, 2008, plaintiff had restored a supply of water to the radiators in his residence, and on that date a chemical substance was again injected into the boiler. In this incident, the plaintiff was able to detect the chemical early due to symptoms like tingling in extremities and an unpleasant taste in his mouth. Plaintiff turned off the heat, opened the windows, and vacated

the residence without further symptoms or distress.

(5)

Plaintiff alleges these robust psychological operations that at times met the legal definition

of torture and included attempted murder were conducted by Jane Doe and the Central

Intelligence Agency to provoke the plaintiff's suicide or retaliatory actions that may have

led the plaintiff to commit crimes and be incarcerated. These objectives were consistent

with a 33 year-old effort on the part of the Central Intelligence Agency to obscure a

preponderance of photographic, familial, and circumstantial evidence that the plaintiff is in

fact the "covert" grandson of the late billionaire industrialist HOWARD ROBARD

HUGHES. The plaintiff intends to invoke the concepts of replevin and detenue in the

Chancery Court of the State of Delaware to begin regaining control of all Hughes assets,

beginning with Hughes Medical Institute, incorporated in 1954, one year prior to the

plaintiff's birth.


Plaintiff seeks to enjoin all defendants from any further action involving the illegal exercise

of police power and internal security functions to prevent the lawful recovery of Hughes

asssets. To compensate the plaintiff for a program of illegal surveillance, harassment,

psychological operations, torture, theft of copyrighted material, distribution of intellectual

property and personal communications to private parties and member agencies of the

United States Intelligence Community in violation of relevant statutes and the First, Fourth,

and Fifth Amendments to the United States Constitution, plaintiff seeks damages as

compensation in the amount of two-hundred fifty million dollars ($250,000,000).

A jury trial is demanded.

William C. Hughes
911 St. Rita Ave. 2 South
St. Louis, MO  63105

October 2, 2007

Thomas J. Byrne
Clayton Chief of Police
227 S. Central Ave.
Clayton, MO  63105

Dear Chief Byrne:

Chief, I have to ask you to do a little investigating. I've lived at 911 St. Rita Avenue, 2 South for 4 years and 5 months, and in the last few years, especially since my police officer neighbor downstairs moved out, I've observed some visitors with some very odd behavior. I've already alerted you to one of these characters, and I am now asking that you formally investigate him and two other individuals, because I just can't come up with a satisfactory explanation for their behavior.

First, we have the boyfriend of my neighbor Mary Rotter, who resides at 911 St. Rita Avenue, 2 North. I do not know this man's name, but he most often drives a gray Mazda 626 with license tags MO  810 ERZ. This young man I have seen driving five different vehicles, six if you count his girlfriend's old car. And, he apparently has more than one place to stay in the neighborhood, because he will come on foot and "sneak" around the building to enter an exit 911 St. Rita without being seen. This man, I have also observed, will "hide out" in his girlfriend's apartment all day. With none of the other neighbors home, at times I will play music at a higher volume or make noise. I am unaware this man is in the building, then he will "pop out" of Ms. Rotter's apartment when I thought no one was home.

I've gone round and round with the City of Clayton Planning Department about boyfriends of female tenants in this building who, although they apparently have separate residences elsewhere, "move in" at 911 St. Rita and then behave oddly. Why hide in the apartment all day without making a sound? I don't know.

I do know, however, from 20 years as a mental health professional, what a sociopath looks like. In late August, two compact discs disappeared from my apartment, and I am quite sure this man took them. Why? Chief Byrne, if you laid eyes on this character, you should know his momma was teaching him how to pick locks at the same age mine was teaching me to read comic strips.

An even more mysterious type resides next door at 907 St. Rita Avenue. He drives a black Jeep Cherokee tagged as FL P29 65M. This Florida fellow has lived there on and off for at least two years. I say "on and off," because he will disappear for months at a time and then and then return. He will also disappear for days or weeks at a time, then return. This man is of concern to me.

FILED

08  9236

FEB - 8 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

because I have noted him to glare at me in a rather hateful manner when our paths cross outside. I don't know why, but I do know I spent three years filing applications in the Missouri Circuit Courts regarding people believed to be mentally ill and dangerous.

This Florida fellow seems to harbor some simmering hostility, and his coming and going does not conform to the academic calendar or any job responsibilities I could imagine—he just comes and goes. Finally, I went to the Clayton Planning Department and found they have no occupancy permit for a man to be residing in that building. I asked his landlord about it, and he said the fee had been paid and a permit filed. We apparently have a discrepancy here, and I'd like you to please look into it.

I would especially appreciate this, because shortly after the Labor Day weekend, ten compact discs of mine walked out the door, and then our Florida man disappeared for about exactly the time it would take for a quick round-trip to Florida. Why? Here again, I believe we have another skilled lock-picker on our hands, because I've had the locksmith over, but as I'm sure you know, if they are good at it, there is just no keeping them out.

I don't have a name for the third big fellow, but he drives a white Ford Explorer with tag number MO 474 4PH. He also drives a new Mazda 6, and his girlfriend's silver Honda civic. He is the boyfriend of my neighbor at 911 St. Rita Avenue, 1 South, Angela De Meo. He also seems to have another "pad" in the neighborhood, because he, like Ms. Rotter's boyfriend, will "sneak" around the building, entering and leaving unseen on foot. These guys don't seem to be happy driving just one vehicle or staying in one residence; why this is, I do not know.

Ms. De Meo's boyfriend has also been noted to have stayed in the apartment all day making no sounds, and I mean no radio/television, no running water, not even a toilet flushed. But, he has been heard banging on the ceiling when my stereo was on, set to a volume where you could have held a conversation in the next room, I suppose to intimidate me and protest the fact I am playing music in my own home. He does not pay rent here, and legally, he does not live here, yet these people seem to think they can harass me.

Why is this going on? Beats me, chief, but they are not running me out of the neighborhood, because I am negotiating to buy a building nearby. Oh, and there have been a few more acts of vandalism against my cars since I last corresponded, but I'm moving out of this building, so I don't much care. Please try to determine what these men were up to, because I don't think it was good, and I'm sure your detectives know sociopaths make for some mighty good liars, but at least the stories will be entertaining.

I'll check back with you in a month or two, and I will be requesting copies of any reports that are generated on these three men.

Thank you,

*William C Hughes*

William C. Hughes

William C. Hughes
911 St. Rita Ave. 2 South
St. Louis, MO  63105

June 1, 2007

Jonas Geissler
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Dear Mr. Geissler:

I feel I must update you on a few most unusual discoveries. Today, quite by accident, I found that every document I have created on my Missouri Department of Mental Health desktop computer is logged with another party as the author. This individual, Peter Scheers, is the manger of another program, and has nothing to do with my ward. I further found that all of my documents created for the Social Work Department, according to the computer, are under the Psychology Department, with one of the psychologists, Mark Felchia, as the "editor."

I'm no fan of mystery novels, but it looks to me like hundreds of documents I created have been logged to appear as if someone else authored them. In addition, for the past several months, I have been the stenographer for the minutes of our weekly treatment team meetings. I put my initials as a footer in the documents, and discovered the initials have been removed.

Of even more interest, once curious, I investigated further and found that my computer is under full administrative control of one Jennifer Boyd, who works in the Central Office of the Department of Mental Health. Jennifer was my "go to" person for computer matters when I worked as Mental Health Coordinator from 08/2000 to 06/2003. The Department, for some reason, nicknames these computer consultants a "sharp."

There would seem to be no reason for Ms. Boyd to be the administrator for my computer presently, since I no longer work for Central Office, rather I am under the Eastern Region Hospital System. When I was a Mental Health Coordinator, Ms. Boyd reported to Richard Gowdy, the statewide Director of Forensic Services. I can only conclude Dr. Gowdy still has an interest in me, for reasons upon which we can only speculate.

I find all of these discoveries to be highly unusual, so I will be taking screenshots of the administrative dialog boxes that show how my work product is being credited to others, again, for reasons that would be speculation at this point. Thank you for your interest.

I would like some answers to these questions, but dare not pose them myself, since the program of retaliation stemming from my report of suspected patient abuse has continued unabated, in my opinion violating CRIPA and RSMo 630.167.

Sincerely,

*William C. Hughes*

William C. Hughes

William C. Hughes
911 St. Rita Ave. 2 South
St. Louis, MO 63105

June 10, 2007

Jonas Geissler
United States Department of Justice
Patrick Henry Building
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Mr. Geissler:

I tried to call you on Friday, and I hope you took the day off, as did I. The purpose of the call was to advise you the possibility exists I will be discharged or resign from St. Louis Psychiatric Rehabilitation Center on Monday, June 11. The reason would be absurd, and I will summarize the situation as briefly as possible.

A case was transferred to me about six months ago. It involves a patient who has a forensic conditional release. This means as far as the legal system is concerned, she's "good to go." I was assigned to the case because the two previous social workers had been frustrated in their efforts to discharge this patient due to the patient's uncooperative daughter who is also her legal guardian.

I "dug in" with this family and established rapport with the daughter/guardian. After the patient and/or daughter had declined two housing options in the community I had located, my patient was tentatively accepted to a reputable group home. The wisdom of the discharge was then questioned by hospital administrators, and our psychiatrist, Omar Quadri, had to come to my defense in a chain of e-mail to clarify that everything had been done properly in consultation with him and the treatment team.

Having dodged that assault, I was then instructed by my Unit Manager, Sheryl Finley, to report to a psychologist from a different ward, Deborah Conger, on the forensic paperwork required, and was given arbitrary deadlines to complete the paperwork and effect the discharge. I say "arbitrary," because I had consulted with the person in charge of coordinating the court filings, Kathy Martin, and was told I had until the end of June to submit this paperwork to allow enough time for the court to process an extension of the patient's conditional release.

I did not meet this arbitrary deadline, because a hospital social worker cannot control the speed with which community agencies move, nor direct recalcitrant legal guardians. However, I succeed where a succession of social workers had failed by having the legal

guardian sign-off on a release of protected healthcare information, and a "Notice of Placement," which is the Department of Mental Health document that consents to community placement. Furthermore, I set a tentative discharge date with the community agency of June 21, 2007.

Concurrently with this good work, Dr. Quadri took a two week vacation, and my social work colleague, Francine Thomas, took a vacation of undetermined length, leaving me covering the ward solo. At the same time, the administration began shuffling patients around from ward to ward, which creates more tasks for the social worker. I believe this was part and parcel of a clear retaliatory pattern going all the way back to the abuse report that started my communication with you.

On that topic, I have two less significant, but notable events to report. One of my patients was recently disciplined for urinating in a cup. This occurred because the unit has one common restroom, which the staff typically keeps locked. They then claim to be too busy to open the door when clients request to be admitted to the restroom. My client, having been denied entry, urinated in the cup and consequently lost his pass privileges.

The legitimate reason for locking the rest room is, we have patients who, if unmonitored, will intoxicate themselves by drinking too much water. This is also why we have bottled water and no drinking fountains, so the patients have to request a cup of water. I've long noted the staff likes to "play games" by denying the clients water. Often when I come on the ward, I briefly function as a "bartender" in serving up cups of water the staff (typically numbering six or more) are too "busy" to get for the patients..

Another item that unfortunately must be mentioned is that I have observed my Unit Manger, Ms. Finley, on two occasions in my proximity during off hours in the community. I am becoming concerned I am being "stalked" and have decided that if I see her again outside the workplace, I am reluctantly applying for an order of protection.

On a positive note, the psychiatric aide I reported had possibly made a threatening gesture, named "B.J.," and the potential witness, Keith Grant, have become my avid companions in shooting baskets with patients on the courtyard. I can only conclude this is a show of support for my effort to determine what is going on at our institution, and I do hope the United States Department of Justice will take an interest in figuring out what that may be.

I thank you again for your interest in this increasingly bizarre situation.


Sincerely,

William C. Hughes

William C. Hughes

William C. Hughes
911 St. Rita Ave. 2 South
St. Louis, MO  63105


June 15, 2007

Jonas Geissler
United States Department of Justice
Patrick Henry Building
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Dear Mr. Geissler:

I've done some research that may explain what transpired at St. Louis Psychiatric Rehabilitation Center, so I've decided to move up my resignation date. I had planned to give them ample notice and leave on July 31, however, my doctor has diagnosed me with a case of exhaustion, and I will now be moving up the date after some convalescence. This, I believe, was directly related to a malicious premeditated program of retaliation contrived by the hospital administration in response to my report of patient abuse, the investigation of which was nothing short of a classic "cover-up."

I want you to know of one event that I amazingly forgot to mention. I was also falsely accused of unauthorized use of the hospital credit card to purchase a television. The television may have cost enough to make this a felony, and the allegation was spelled out in e-mail from the business office that presented it as a conclusion, not suspicion. This e-mail, unlike those at the Republican National Committee, I hope will be preserved.

There was, of course, nothing untoward about my use of the credit card to make purchases for patients. This matter was cleared up after no small amount of drama, and I think it is no mystery about why such allegations were made. To summarize, two of my patients were abused, I was threatened with bodily harm, documents of mine were removed from the medical records, all of my computer files had others listed as creator of the documents, my new car was "keyed" (scratched), I have been stalked by one of my supervisors, and I was falsely accused of a crime.

You said you weren't sure what to say about my letter dated June 1, 2007, but you might want to consider tossing it over the transom to the criminal division. This has been one job I would prefer not to muse about after separation, but as a writer, it is now in the queue as another book waiting to be written.


Sincerely,

William C. Hughes

William C. Hughes













JS-44
(Rev.1/05 DC)

PAMELA John FINKEL

**I (a) PLAINTIFFS**

WILLIAM CHARLES HUGHES

MERRIMACK

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES) 88888

**DEFENDANTS** _____, A PERSON
CLAIMING CIA AFFILIATION; MISSOURI
DEPARTMENT OF MENTAL HEALTH;
KEITH SCHAFER; RICHARD GOWDY; LORI DEROSEAR;
COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT BROWARD SHERYL
(IN U.S. PLAINTIFF CASES ONLY) FINLEY
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
T...

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

WILLIAM CHARLES HUGHES
30 CENTRE ST. APT. #1
CONCORD, NH 03301 (603)224-2046

Case: 1:08-cv-00236
Assigned To : Sullivan, Emmet G.
Assign. Date : 2/8/2008
Description: Pro Se General Civil

JURY ACTION

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☑ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE an x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

**☐ D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Immigration**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus- Alien
Detainee
☐ 465 Other Immigration Actions

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant

☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.

☐ 460 Deportation
☑ 470 Racketeer Influenced & Corrupt
Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if not
Administrative Agency Review
or Privacy Act)

6

| □ **G.** *Habeas Corpus/ 2255* | □ **H.** *Employment Discrimination* | □ **I.** *FOIA/PRIVACY ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ **K.** *Labor/ERISA (non-employment)* | □ **L.** *Other Civil Rights (non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**ⓧ ORIGIN**

☒ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

RICO SECTIONS 241, 373, AND 1964 - RACKETEERING

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS   □ ACTION UNDER F.R.C.P. 23   **DEMAND $** # 250,000,000   Check YES only if demanded in complaint   **JURY DEMAND:** ☒ YES   □ NO

**VIII. RELATED CASE(S) IF ANY** *N.F.*   (See instruction)   □ YES  ☒ NO   If yes, please complete related case form.

**DATE** 02-08-08   **SIGNATURE OF ATTORNEY OF RECORD**   *William Charles Hughes*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd